IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WARREN WILLIAMS,

                                Plaintiff,                                OPINION AND ORDER

          v.                                                                20-cv-957-wmc

DETECTIVE SELTZNER, POLICE OFFICER WEBERPAL,
SGT. MATT SCHROEDI, DETECTIVE NORDQUIST,
DETECTIVE REITMEIER, SGT. OLSEN,
DETECTIVE NIELSEN, DETECTIVE GARDNER,
SPECIAL AGENT PRIEVE, POLICE OFFICER MYER
and DEPUTY SIMPSON,

                                Defendants.

          Representing himself in this case, plaintiff Warren Williams was granted leave to
proceed on claims of excessive force, failure to intervene, illegal search, and conspiracy
against defendants Joseph Weberpal, Matt Schroedl, Matthew Nordquist, Scott Reitmeier,
and Kimberly Meyer (the "City Defendants"), Brian Prieve and Truli Nielsen (the "State
Defendants"), and Clint Seltzner, Heidi Gardner, Mark Olson, and Frank Simpson (the
"County Defendants").   (Dkt. #26.)   Subsequently, the City Defendants, State
Defendants, and County Defendants separately filed motions for summary judgment on
Williams' claims against them.   (Dkts. ##48, 57, 62.)   After his summary judgment
briefing deadlines had passed, Williams also filed a motion for assistance recruiting counsel.
(Dkt. #80.)   For the following reasons, the court will grant defendants' motions for
summary judgment and deny Williams' motion for assistance in recruiting counsel.

UNDISPUTED FACTS[1]

**A. Background**

Plaintiff Williams is a resident of Wisconsin.  Defendants Weberpal and Schroedl are police sergeants; Nordquist is a detective lieutenant; Reitmeier is a detective sergeant; and Meyer is a detective.  All are still employed by the Madison Police Department ("MPD").  However, at all times relevant to their actions in this lawsuit, Weberpal was employed as an MPD police officer; and Nordquist and Reitmeier were employed as MPD detectives.  In turn, defendants Prieve and Nielsen are special agents with the Wisconsin Department of Justice's Division of Criminal Investigation, although at all times relevant to this lawsuit, Nielsen served as a detective with the University of Wisconsin-Madison Police Department.  Finally, the County Defendants are, and were at all relevant times, serving in the following positions with the Dane County Sheriff's Department:  Seltzner and Gardner, detectives; Olson, sergeant; and Simpson, deputy.  During the relevant period, *all* the individual defendants were also members of the Dane County Narcotics Task Force ("Task Force").

In his role as a Task Force detective, Reitmeier oversaw an investigation into cocaine distribution in Dane County during the late summer of 2019.  Among other things, his investigation revealed that Williams was distributing cocaine.  In late September and early October 2019, an undercover police officer bought nearly three grams of crack cocaine at Reitmeier's direction from a man believed to be Williams in three, separate sales.  Based

---

[1] Unless otherwise indicated, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings and other materials in the record.

on those purchases, Reitmeier believed he had probable cause to arrest Williams for three counts of felony cocaine delivery to the undercover officer.

### B. Task Force Briefing and Surveillance

In advance of taking Williams into custody on October 10, 2019, then-MPD Detective Reitmeier began surveilling an address in Madison that Williams had identified as his residence to his probation officer.[2]  At approximately 7:30 a.m. that day, MPD Sergeant Schroedl led a briefing of Task Force members assigned to this surveillance operation, including defendants Weberpal, Nordquist, Seltzner, Olson, Gardner, Simpson, Prieve, and Nielsen.  Schroedl's purpose for the meeting was to provide an overview of the plan for apprehending Williams.  Accordingly, in addition to Williams' vehicle information, known associates, and appearance, Schroedl specifically discussed Williams' criminal history, including 2018 convictions in Wisconsin state court for felony reckless driving and eluding, as well as the outstanding probable cause to arrest him for cocaine delivery.  As Schroedl explains in his declaration, reviewing a suspect's criminal history is a standard part of any pre-apprehension briefing, given its relevance to officers' safety during an arrest.  (Schroedl Decl. (dkt. #50) ¶ 5.)  Schroedl also advised then-MPD Officer Weberpal that he was the assigned, uniformed contact officer who would make the actual arrest of Williams were he located.  According to Williams, defendants also conspired to

---

[2] According to Williams, Reitmeier "lied" about the address he provided to his probation officer; instead, he asserts that his "listed" address was in Sun Prairie, Wisconsin.  (Dkt. #72, at 2.) However, even if Reitmeier or the probation officer had misrepresented Williams' address -- an accusation for which there is no support in the record -- it would not be material to Williams' claims here.

deprive him of his constitutional rights during the same meeting, but there is no direct evidence of this.

Members of the Task Force then deployed to the area of Williams' residence at the briefing's conclusion, and shortly after, Detective Reitmeier identified Williams entering the location believed to be his residence. However, because Williams departed in a Chrysler SUV soon after his arrival, surveillance units began following him to make an arrest. Williams next drove around the East Washington Avenue area of Madison, where he made several maneuvers in what then-MPD Detective Nordquist perceived to be an attempt to shed surveillance. (Nordquist Decl. (dkt. #51) ¶ 5.) While Williams was driving, Sergeant Schroedl also observed him making "multiple short term contacts" with various individuals, behavior Schroedl believed to be consistent with drug trafficking. (Schroedl Decl. (dkt. #50) ¶ 11.) Based on Williams' history of eluding arrest, Schroedl advised the arrest team members that an attempt to take Williams into custody would be made at a time providing the best opportunity to prevent him from fleeing in a vehicle.

## C. Williams' Arrest

At approximately 9:40 a.m., Williams was driving westbound on East Washington Avenue near its intersection with First Street. Traffic was stopped at a red light, and uniformed officers were close to Williams' vehicle. As he approached the traffic light, Williams was in the leftmost lane and stuck behind several cars. At that point, Dane County Detective Seltzner and Officer Weberpal were in an unmarked Task Force minivan following Williams and were able to pull up alongside his vehicle in the middle lane. Moreover, Detective Nordquist had managed to park his unmarked police car directly

behind Williams, so that he could not flee in reverse.  As a result, Sergeant Schroedl ordered Seltzner and Weberpal to attempt to take Williams into custody.

Upon exiting his vehicle, Officer Weberpal, who was dressed in full MPD military-style uniform, approached Williams' vehicle from behind.  Based on Weberpal's training and experience, he was aware that individuals who buy and sell controlled substances often carry firearms to protect themselves.  Further, Williams' vehicle had tinted windows, making it difficult to see inside.  As Weberpal approached the driver's side door of Williams' vehicle, therefore, he unholstered his service weapon and aimed it at Williams until Weberpal could be sure that Williams did not have a weapon in his hands.[3] Meanwhile, Detective Seltzner, dressed in a Dane County Sheriff's Office detective jacket and bulletproof vest, approached the passenger side of Williams' vehicle.

Once Detective Seltzner reached the passenger door, he opened it and announced himself as a police officer, with his service weapon drawn and pointed at Williams.  When Officer Weberpal was at the driver's side door, he also announced himself as a police officer and gave loud, clear verbal commands to Williams to put the vehicle in park and to put his hands up.  While giving those commands, Weberpal noticed that Williams was

---

[3] In his complaint, Williams claimed that Officer Weberpal aimed his gun at his head and held it up to his temple.  (Pl.'s Compl. (dkt. #1, ¶ 5).)  In contrast, Weberpal maintains that he did not aim his service weapon at Williams' head and that his gun never touched Williams' temple. (Weberpal Decl. (dkt. #49) ¶ 14.)  During his deposition, Williams initially swore that it was actually Seltzner who "put the gun to [his] head" (Williams Dep. (dkt. #71) 19), but later testified that it was Weberpal.  (*Id*. at 54.)  For purposes of summary judgment, therefore, the court must accept Williams' version of events, particularly given the absence of *any* police video of the events surrounding his arrest.  As this court has previously noted, the absence of such video when a task force has been formed to make a challenging arrest itself increasingly exposes law enforcement officers to claims like those present here.

manipulating two cell phones in his lap.  Officer Weberpal then opened the unlocked driver's side door to apprehend Williams, while Seltzner lowered his handgun.

With his car still running and in drive, Williams claims that he did not initially "recognize or process" that Detective Seltzner was at the passenger door.  (Pl.'s Compl. (dkt. #1, ¶ 4).)  Upon seeing Seltzner's vest, however, Williams realized that he was being approached by the police.  (Williams Dep. (dkt. #71) 11-12.)  Then, as Officer Weberpal opened the driver's side door, Williams reached into his front left shirt pocket with his left hand.  Because Weberpal did not believe that Williams was accessing a weapon at that time but was still concerned that he might flee in the vehicle, Weberpal also re-holstered his gun and reached in to grab Williams by his left wrist, while ordering him to get out of the vehicle.  Weberpal then pulled Williams out of his vehicle and, at least according to Williams, "threw [him] on the ground" on the grass median along East Washington Avenue.  (Williams Dep. (dkt. #71) 12.)

After being removed from his car, Williams first turned and faced Officer Weberpal, then tried to remove himself from Weberpal's grip and turned his body away from Weberpal, who believed that Williams was attempting to free himself and flee.  Observing Weberpal from his vehicle, Detective Nordquist also believed that Williams was trying to run away.  Weberpal then pulled Williams' left wrist in and wrapped his right arm around Williams' body.  According to the officers, it was only then that Weberpal brought Williams to the ground.  Regardless, once Williams was on the ground, Weberpal lost control of his wrist, but was able to maintain control of his body by laying belly-first, on

6

Williams' back.[4]  At that point, Williams had both of his hands underneath him, and because Weberpal felt that he was still trying to pull away from underneath him, Weberpal told Williams to stop resisting and put his hands behind his back.  Other Task Force members who were on the scene also came in to assist Weberpal with pulling Williams' wrists out from under his body so that Weberpal could handcuff him.  Williams denies resisting arrest, but Williams concedes that an officer "in Weberpal's shoes" could assume that he was resisting arrest.  (*Id*. at 58.)  Regardless, at this point, Williams claims that Weberpal then placed him in a chokehold, prompting him to tell the officers that he could not breathe.  (*Id*. at 16, 51-54.)

Meanwhile, MPD Sergeant Schroedl was in his unmarked vehicle, further back in traffic.  Still, Schroedl observed that Williams was beginning to resist as Weberpal removed him from the car.  Wearing plainclothes and a black ballistic vest with a hanging police badge centered on his chest, Schroedl then went to assist with the arrest.  As he approached the median where the arrest was taking place, Schroedl further observed that Williams had taken his left hand and shoved it near his waistband.  Schroedl heard other Task Force members tell Williams to stop resisting and place his hands behind his back.  Because Williams was not complying with officers' commands, Schroedl admits to delivering two punches to Williams' lower back, at which point officers were able to free his left hand from underneath his body.  However, because Williams continued to struggle, Schroedl

---

[4] According to Williams, he only weighed 130 or 148 pounds at the time of his arrest.  (Pl.'s Am. Compl. (dkt. #11, ¶ 45)); (Williams Dep. (dkt. #71) 18.)

then grabbed Williams' feet and pulled him backwards, so that he was lying flat on his stomach.

At this point, MPD Detective Nordquist, who was wearing a vest with police markings, had also exited his vehicle to assist in the arrest. Because Weberpal was attempting to handcuff Williams by the time he reached them, Nordquist grabbed Williams' right arm, which he thought was being pulled away, and could feel Williams moving his entire torso and chest, as if he were trying to escape. Nordquist then placed his right knee across Williams' upper back and shoulder blades and pulled Williams' right hand out from behind his back. At that point, Weberpal placed Williams in handcuffs.

Once Williams was handcuffed, Detective Nordquist asked him if he was okay, and Williams informed Nordquist that he was uninjured. Williams was searched by Detective Seltzner incident to his arrest. Seltzner recovered two Apple iPhones during Williams' arrest and kept them on his person until they could be packaged as evidence. Williams was subsequently transported by Dane County Deputy Simpson to the MPD's North District Station, and ultimately, the Dane County Jail, where he was booked without incident. While being transported by Simpson, Williams told him that he was experiencing mild arm pain.

While part of the arrest team, MPD Detective Reitmeier was several cars behind Williams' vehicle when other Task Force members detained him. By the time Reitmeier had exited his vehicle and reached the median, Williams was already handcuffed. Reitmeier never used any force against Williams. Similarly, defendants Prieve, Nielsen, and Meyer played no personal role in Williams' actual arrest. Given the heavy traffic on

8

East Washington Avenue at the time, Wisconsin Special Agent Prieve redirected vehicles around the incident.  Then-UW-Madison Detective Nielsen was on surveillance duty while the arrest took place, and by the time she reached the median where Williams was being detained, he was already under the control of the arresting officers.[5]   Finally, MPD Detective Meyer was not present at all when Williams was taken into custody by other members of the Task Force.

### D. Post-Arrest

While Williams was at the North District Station, MPD Detective Reitmeier attempted to interview him and read him his *Miranda* rights.  However, Williams declined to answer any questions.   The iPhones collected at the scene of Williams' arrest by Detective Seltzner were logged into evidence by Task Force members.  Reitmeier states that he was not involved in processing either cell phone, nor did he photograph or search either cell phone, or record any information accessible from either cell phone.  (Reitmeier Decl. (dkt. #52) ¶¶ 18-20.)  However, Williams claims that Reitmeier "illegally went in [his] phone without [his] permission [or] consent and took pictures of [his] iCloud and phone numbers and whatever else."  (Williams Dep. (dkt. #71) 65.)  However, Williams also conceded that he did not know what Reitmeier was actually doing with his phone, if anything, and that he could have just been looking at it.  (*Id*. at 66, 75.)  Williams also maintains that Reitmeier took photographs of phone numbers taken from his iPhone that he had written down upon Reitmeier's request.  (*Id*. at 68.)  After Williams was arrested,

---

[5] For purposes of completeness, Nielsen did also subsequently join Seltzner removing Williams' car from East Washington Avenue.

defendant Nielsen and other officers also conducted a lawful Act 79 search of the residence where he was purportedly staying.[6]

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

Thus, summary judgment is often referred to as the "put up or shut up" moment for parties seeking to take their claims to trial, at least in the Seventh Circuit. *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Specifically, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts"; he must respond to defendants' showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish there is a genuine triable issue. *Anderson*, 477 U.S. at 256-57, 261. And because those facts must be admissible at trial, plaintiff may not rely on

---

[6] As discussed more fully below, Act 79 is a provision of Wisconsin state law that permits law enforcement officers to conduct searches of a probationer's home and property on his person where officers know of his probation status and suspect that he has violated the terms of his probation, committed a crime, or was in the process of committing a crime.

inadmissible hearsay, speculation, or conclusory allegations to defeat summary judgment. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999).  Finally, a factual dispute can preclude summary judgment, but only if the facts "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

Here, plaintiff has failed to adhere to the court's standard summary judgment procedure, which was provided to him on or about September 12, 2023, and required each proposed finding of fact to be limited to a single proposition, followed by references to evidence supporting the proposed fact.  (*See* dkt. ##75-77.)  While it is within a court's discretion to consider only properly cited proposed findings of fact, *see Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 274 F.3d 1174, 1178 (7th Cir. 2001), the court recognizes that plaintiff is representing himself and generally construes his filings as broadly as possible.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).  Nevertheless, there are limits to this construction, and courts are not "obliged . . . to scour the record looking for factual disputes" that might save a litigant without a lawyer from losing at summary judgment.  *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001).

In the middle of summary judgment briefing, plaintiff filed a motion seeking assistance in recruiting counsel (dkt. #80), and the court understands that plaintiff may have memory issues arising from his history of drug use and his involvement in two car accidents earlier this year.  (Williams Dep. (dkt. #71) 40-41.)  With that in mind, the court has made every effort to review his pleadings and the evidence of record, including his deposition transcript, in the light most favorable to him.  However, for the following

reasons, defendants are entitled to summary judgment on all of plaintiff's claims, and the court must deny plaintiff's request for assistance in recruiting counsel as well.[7]

## I.  Motion for Assistance in Recruiting Counsel

As a threshold matter, the court will address plaintiff's renewed request for assistance in recruiting counsel.  Litigants in civil cases do not have a constitutional right to counsel, and the court does not have the authority to appoint counsel to represent a plaintiff who is representing himself in a civil matter.  Rather, the court can only assist in recruiting counsel who may be willing to serve voluntarily.  *See* 28 U.S.C. § 1915(e)(1); *Pruitt v. Mote*, 503 F.3d 647, 654, 656 (7th Cir. 2007) (en banc).  A party requesting assistance in recruiting counsel must show three things:  (1) he cannot afford to hire a lawyer, 28 U.S.C. § 1915(e)(1); (2) he made reasonable efforts on his own to find a lawyer to represent him, *Jackson v. Cnty. of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992); and (3) the legal and factual difficulty of the case exceeds his ability to prosecute it, *Pruitt*, 503 F.3d at 655.  Since plaintiff was allowed to bring this case with a partial payment of fees, *see* 28 U.S.C. § 1915(b)(1), he has presumably met the first requirement.  (*See* dkt. #7.)

Although plaintiff previously reached out to two law firms seeking representation in the fall of 2020, both of which declined to represent him (dkt. #17-1), he still has not made a sufficient factual showing that would require the court to assist him in finding an

---

[7] For this reason, the court will not reach defendants' alternative assertion of qualified immunity, except with respect to defendant Weberpal's assertion of qualified immunity as it relates to plaintiff's claims for allegedly pointing his weapon to plaintiff's temple and placing plaintiff in a chokehold.

attorney.  Specifically, in this renewed motion, plaintiff represents generally that he has "tried to seek help through [other] law [firms] but [has] not [received any] response back yet." (Dkt. #80, at 1.)  Unlike in his previous requests for assistance, plaintiff has provided no evidence -- such as the names of attorneys or law firms to whom he has reached out or copies of correspondence sent out -- that would allow the court to assess whether he has, in fact, made reasonable efforts to obtain counsel or otherwise been precluded from doing so on his second go.  Accordingly, his request would fail there.  *See Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (reaching out to counsel on one's own is a "mandatory, threshold inquiry that must be determined" before evaluating plaintiff's ability to prosecute his case).  At any rate, plaintiff does not provide any examples of specific legal tasks he cannot complete on his own or for which he needs an attorney.  Most importantly, his filings, including his summary judgment submissions, demonstrate that he understands his case and is capable of responding at least through this phase of his case.  Finally, since the court is granting defendants' motions for summary judgment for the reasons explained below, plaintiff's motion for assistance in recruiting counsel must also be denied as moot in any event.

## II. Defendants' Motions for Summary Judgment

The court addresses below the specific evidence and arguable merit as to each of plaintiff's claims separately based on the record at summary judgment.

## A. Excessive Force

Plaintiff's first set of claims involves allegations that defendants Weberpal, Schroedl, Nordquist, and Seltzner used excessive force when arresting him. Plaintiff contends that he did not present a danger to Seltzner and Weberpal when they approached his car. He further alleges that: (1) Weberpal slammed him to the ground and choked him; (2) Nordquist painfully kneeled on his upper back; and (3) Schroedl punched him several times, then dragged him by his feet while handcuffed. Plaintiff adds that, during these uses of force, he lay flat and did not resist arrest or his being handcuffed. During his deposition, plaintiff also alleged that it was unreasonable for both Seltzner and Weberpal to grab his wrists while detaining him.[8] (Williams Dep. (dkt. #71) at 48.) However, in plaintiff's deposition, he also acknowledged that it would have appeared to officers that he was resisting arrest. (*Id*. at 58.) Defendants, for their part, argue that any force used to subdue Williams during his arrest was reasonable.

The basic question for an excessive force claim under the Fourth Amendment is whether the officer used "greater force than was reasonably necessary." *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016); *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). This determination is made from the perspective of a reasonable officer in light of

---

[8] In the alternative, Williams also claimed that it was unreasonable for defendants to detain him on East Washington Avenue when he could have been arrested during a meeting with his probation officer, with whom he met regularly, instead. (Williams Dep. (dkt. #71) 99.) However, plaintiff did not develop this argument, and in any case, as long as "police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir. 1989). Further, an officer is entitled to "make a warrantless arrest consistent with the Fourth Amendment if there is probable cause to believe that a crime has been committed." *United States v. Haldorson*, 941 F.3d 284, 290 (7th Cir. 2019).

the totality of the circumstances known to the officer, without regard to his or her intent or subjective beliefs. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Williams v. Indiana State Police Dep't*, 797 F.3d 468, 472–73 (7th Cir. 2015); *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). Ultimately, "whether a particular use of force was objectively reasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (*quoting Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)).

For purposes of an excessive force claim, "reasonableness" lacks precise definition but requires a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Abbott*, 705 F.3d at 724 (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). Relevant factors include "the severity of the crime; whether the suspect posed an immediate threat to the officers or others; whether the suspect was resisting or evading arrest; whether the individual was under arrest or suspected of committing a crime . . . and whether the person was interfering or attempting to interfere with the officer's duties." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). In particular, officers can take their awareness of a suspect's history into account when deciding on a reasonable amount of force to use during an arrest. *Burton v. City of Zion*, 901 F.3d 772, 781 (7th Cir. 2018) (citing *DeLuna v. City of Rockford*, 447 F.3d 1008, 1010, 1012 (7th Cir. 2006)). Because police officers are "often forced to make split-second judgments" under "circumstances that are tense, uncertain, and rapidly evolving," *Abbott*, 705 F.3d at 724 (quoting *Graham*, 490 U.S. at 397), they are given "considerable leeway" with respect to the appropriate amount

15

of force to use in a particular situation. *Id*. (quoting *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009)).

In this case in particular, there is no dispute that defendants had probable cause to arrest plaintiff. As a result, "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion." *Graham*, 490 U.S. at 396. Because each discrete use of force against plaintiff must be separately justified, the court will analyze the reasonableness of each challenged action in turn. *See Dockery*, 911 F.3d at 467.

### 1. Takedown

To begin, plaintiff claims that it was unreasonable for MPD Officer Weberpal to take him to the ground after pulling him out of the car he was driving. When viewed against the relevant factors set forth in *Graham*, however, this claim lacks any merit. 490 U.S. at 396-97. Weberpal was arresting plaintiff for a felony drug distribution offense -- a serious crime. Understandably, plaintiff was "kind of confused" when Weberpal and Dane County Detective Seltzner approached him and was "in shock" when he saw defendants' guns. (Williams Dep. (dkt. #71) 11-12.) While catching plaintiff off-guard was obviously intentional by defendants, plaintiff further admits that defendants may well have "thought he was resisting" by keeping his seatbelt on in the car, as well as failing to respond even after he began to understand the circumstances and intent of the officers to arrest him. (*Id*. at 30.) Plaintiff also does not dispute that rather than responding to their commands, he was still manipulating two phones on his lap, and that the car was still running in drive. (*Id*. at 12.)

Given the potential for plaintiff to flee in the still-running vehicle, his history of previously evading police, his apparent lack of cooperation with the arresting officers, and at least the possibility that plaintiff was destroying evidence while manipulating the phones on his lap, a reasonable, objective officer had ample justification to open the driver's side door, pull plaintiff out of his car, and take him to the ground.  Under those circumstances -- and even viewing the facts in the light most favorable to plaintiff *and* ignoring his known history of flight -- it was still obviously reasonable for Weberpal to use a higher degree of force to protect himself and the community from an individual suspected of committing a drug-related felony.  *See Smith v. Ball State Univ.*, 295 F.3d 763, 769 (7th Cir. 2002) (officers can forcibly remove a nonresponsive, potentially intoxicated driver from a vehicle).  Thus, a reasonable jury could not find Weberpal's takedown objectively excessive when weighed against the governmental interest in ensuring officer and public safety, as well as avoiding the destruction of evidence.  *See Muehler v. Mena*, 544 U.S. 93, 98-99 (2005); *Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001).

### 2. Gun to Head

Next, plaintiff claims that defendant Weberpal put his service weapon to plaintiff's temple.  While both Weberpal and Seltzner deny doing this, the court must assume they did.  Plaintiff's problem is a lack of evidence to suggest that briefly holding a pistol to an uncooperative arrestee's head constitutes an *unreasonable* use of force.  Certainly, when an officer puts a gun to someone's head, that *is* a use of force.  *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 991 (7th Cir. 2021).  And using such force is unreasonable when a subject is subdued and complying with orders.  *Id.* (citing *Johnson v. Scott*, 576 F.3d 658, 660 (7th

17

Cir. 2009)).  However, pointing a gun during a valid investigatory stop -- let alone as part of an attempted arrest -- is not *per se* unreasonable, *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989), and courts rarely find constitutional violations for gun pointing when there is a reasonable threat of danger or violence to the police.  *Baird*, 576 F.3d at 346-47.

Here, defendants knew they were arresting a suspect for a drug crime who had not yet demonstrated even an inclination to surrender.  To the contrary, again, plaintiff acknowledges that objectively he may have appeared to be resisting arrest.  (Williams Dep. (dkt. #71) 58.)  Even if defendant Weberpal had held a gun to plaintiff's temple while handcuffing him, it would not have constituted excessive force given this apparent resistance.  *E.g., Stricker v. Twp. of Cambridge*, 710 F.3d 350, 363-64 (6th Cir. 2013) (upholding grant of summary judgment where defendant state trooper allegedly pointed a gun at resisting arrestee's temple).  Finally, the court is unaware of any controlling Supreme Court or Seventh Circuit precedent putting police on notice that his conduct would constitute excessive force under circumstances sufficiently similar to deny defendant Weberpal qualified immunity for any monetary damage award.

### 3. Chokehold

Plaintiff also claims that defendant Weberpal used excessive force by placing him in a chokehold before handcuffing him, which Weberpal again denies.  However, since the court must assume otherwise, this claim presents a much closer question.[9]  It is well-

---

[9] Weberpal admits to laying belly-first on Williams' back, (Weberpal Decl. (dkt. #49) ¶ 22), but this is well outside of prohibited force on a seemingly uncooperative arrestee.  *See* discussion, *supra.*

established in this circuit that it is objectively unreasonable for an officer to use significant force on an unresisting or passively resisting subject during an arrest.  *See Abbott*, 705 F.3d at 732; *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 687 (7th Cir. 2007).  That remains the case where the detainee may have previously refused to comply with officers' orders or even posed a threat to their safety.  *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014).  Choking, in particular, can give rise to an excessive force claim.  *E.g., Coley v. Lucas Cnty.*, 799 F.3d 530, 541 (6th Cir. 2015) ("Chokeholds are objectively unreasonable where an individual is *already* restrained or there is no danger to others.") (emphasis added); *Est. of Booker v. Gomez*, 745 F.3d 405, 425 (10th Cir. 2014) (denying officer's motion for summary judgment on arrestee's excessive force claim because "[officer] used the carotid restraint for approximately two and a half minutes" and "continued to use the restraint while [plaintiff] was handcuffed in a prone, face-down position on the ground").

However, the chokeholds giving rise to a trial were all far more extreme than in this case, where in plaintiff's own words, "everything happened so fast."  (Williams Dep. (dkt. #71) 53.)  Even construing the facts in the light most favorable to plaintiff -- and setting aside defendants' denial that any chokehold took place altogether -- plaintiff can marshal evidence that, at most, he was briefly restrained while being arrested, was able to tell officers that he could not breathe, and later told them he was uninjured.[10]  Plaintiff has

---

[10] Although plaintiff does not need to show that he was physically injured in order to state an excessive force claim, *Baird*, 576 F.3d at 344, the extent of any injury -- or lack thereof -- to plaintiff is relevant in an excessive force inquiry "because it provides some indication of the amount of force applied, and because it may suggest whether the use of force was plausibly necessary in a particular situation[.]"  *McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019).

not cited any case law for the notion that briefly choking someone, in the course of what he concedes objectively appeared at that point to be active resistance to an arrest, can give rise to an excessive force claim, particularly where no injury occurred.  (*Id*. at 58.)  Nor has the court found any such precedent.

Accordingly, defendants argue that even if Weberpal were not entitled to summary judgment on the merits of plaintiff's Fourth Amendment claims, his brief chokehold is still protected by qualified immunity.  Again, for plaintiff to overcome Weberpal's qualified immunity defense, he must show that Weberpal violated his clearly established constitutional right.  *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017).  Law is clearly established on an excessive force claim if:  (1) there is a "closely analogous case" holding that the specific type of force used by the defendants is excessive; or (2) "a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question."  *Cibulka v. City of Madison*, 992 F.3d 633, 639-40 (7th Cir. 2021) (internal quotation marks and alterations omitted).   However, clearly established law is not defined at a "high level of generality[,]" *Kisela v. Hughes*, 584 U.S. ----, 138 S. Ct. 1148, 1152 (2018) (per curiam); rather, the controlling precedent must be "particularized to the facts of the case."  *Dockery*, 911 F.3d at 466.  This is especially important in excessive force cases, because the "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case."  *City of Escondido v. Emmons*, 586 U.S. ----, 139 S. Ct. 500, 503 (2019) (per curiam).

Plaintiff has not engaged with the merits of defendant Weberpal's qualified immunity claim, and a failure to show that his allegedly violated right was clearly

established is "fatal for [his] case." *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018) (citing *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)).  More to the point, even if plaintiff *had* advanced an argument, he could not have met his burden to defeat Weberpal's qualified immunity defense because, to the extent there may be case law that helps plaintiff's case, this circuit has held that "significant force is unreasonable *after* a suspect has stopped resisting." *Alicea v. Thomas*, 815 F.3d 283, 288-89 (7th Cir. 2016) (emphasis added); *see also Snowden v. Henning*, 72 F.4th 237, 246 (7th Cir. 2023) ("the legal landscape of excessive-force claims is well settled, with decades of circuit precedent applying the Supreme Court's test announced in *Graham v. Connor*"); *Miller*, 761 F.3d at 829 ("the law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest"); *Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (jury could conclude grabbing "docile and cooperative" accused of disorderly conduct, twisting his arm, shoving him toward the wall, and taking him to the floor was excessive force).

Moreover, given the differences between plaintiff's suspected crimes and the conduct of arrestees in those other cases, none of these legal authorities is sufficiently on point. Again, plaintiff not only admits that he appeared to be resisting arrest for a felony drug offense when Weberpal allegedly placed plaintiff in a chokehold, but plaintiff also had yet to be handcuffed.  Based on the undisputed facts, therefore, Weberpal is entitled to qualified immunity on plaintiff's claim that he exercised unreasonable force by briefly choking him.  Said another way, a brief chokehold causing no harm does not violate any clearly established right, let alone one that Weberpal would have received notice of, so

plaintiff cannot present a claim for monetary damages to a jury. *See Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) ("Only when precedent places the invalidity of a particular action beyond debate may damages be awarded.")

### 4. Knee on Back

In addition, plaintiff claims that defendant Nordquist used excessive force in kneeling on his upper back and shoulder blades while pulling his right arm out from underneath him, ostensibly to help defendant Weberpal handcuff him. Again, since there is no dispute that an objective officer could have perceived that plaintiff was resisting arrest, "[t]he reasonableness of kneeling on a prone individual's back during an arrest turns, at least in part, on how much force is applied." *Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005). More specifically, the Seventh Circuit explained in *Abdullahi* that "[k]neeling with just enough force to prevent an individual from 'squirming' or escaping might be eminently reasonable, while dropping down on an individual or applying one's full weight (particularly if one is heavy) could actually cause death." *Id*. Even when the evidence at summary judgment is viewed in the light most favorable to plaintiff, including that he weighed approximately 130 pounds at the time of his arrest, a jury would have to find that Nordquist's application of force fell squarely on the reasonable end of the spectrum, because not only could a reasonably objective officer have believed plaintiff was resisting arrest, but even plaintiff does not assert that Nordquist applied more force than necessary, much less struck or dropped down on plaintiff with his knee. To the contrary, he reported suffering no injuries as a result of Nordquist placing his knee on his back. *Cf. Becker*, 821 F.3d at 928 (placing knee on arrestee's back may be reasonable where he does

not allege a back injury, is charged with a serious offense, and does not obey an officer's commands).

### 5. Other Uses of Force

Plaintiff further claims that defendant Schroedl punched his lower back several times, then dragged him by his feet after he was handcuffed.  MPD Sergeant Schroedl admits to (1) delivering two punches to plaintiff's lower back to free plaintiff's left hand from underneath his body, and (2) grabbing his feet and pulling him backwards so that he was lying flat on his stomach.  (Schroedl Decl. (dkt. #50) ¶¶ 20-21.))  However, Schroedl swears that plaintiff was handcuffed *after* he was pulled backwards.  (*Id*. at ¶ 21.)  Force can be excessive "if, in light of the totality of the circumstances, it was greater than was reasonably necessary to effectuate the seizure." *Holmes*, 511 F.3d at 685.  Even if the court assumes plaintiff had already been handcuffed when Schroedl pulled him down the grassy median on East Washington Avenue, as it must at summary judgment, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (cleaned up).  Officers had a clear interest in detaining plaintiff -- who after all, was being arrested at the tail end of the normally congested morning commute on a central thoroughfare in the City of Madison's

isthmus[11] -- and ensuring that the public, the officers and he were safe during that process. Plaintiff has not pointed to any evidence suggesting otherwise.

Finally, plaintiff alleged during his deposition that it was unreasonable for both defendants Seltzner and Weberpal to grab his wrists while detaining him. Again, pulling the arms of a cooperative and non-threatening suspect can constitute excessive force. *See Payne v. Pauley*, 337 F.3d 767, 778-79 (7th Cir. 2003). However, given that it is normal for an officer to grab an individual's wrists during an arrest -- and in particular where the arrestee is resisting the officers' efforts to subdue him -- a jury would have to conclude that it was reasonable for Detective Seltzner and Sergeant Weberpal to do so while trying to handcuff plaintiff.

Taking the record on summary judgment as a whole, therefore, a reasonable jury would have to find on the undisputed facts that defendants Weberpal, Schroedl, Nordquist, and Seltzner did not use excessive force while arresting plaintiff.[12] *Cf. Cyrus v.*

---

[11] The court takes judicial notice that East Washington Avenue is one of the busiest and most dangerous roads in Dane County. Fed. R. Evid. 201(b)(1); *see also* Naomi Knowles, *East Washington Avenue: A deadly problem*, WISC CHANNEL 3000, July 15, 2021, https://www.channel3000.com/news/for-the-record/east-washington-avenue-a-deadly-problem/article_6958ff06-5453-5cc4-abca-5572606fa08c.html ("East Washington carries about 50,000 cars a day -- a load comparable to a highway -- channeling workers into the heart of Madison's primary economic engines, the capitol and the campus.").

[12] During his deposition, plaintiff suggested that defendants "didn't have to punch [or] drag [him]" because they "have tasers [and] pepper spray." (Williams Dep. (dkt. #71) 30.) However, he provides no evidence or case law to suggest that the use of a taser or pepper spray would have been less painful or more reasonable than the force that defendants did apply to him. Relatedly, unnecessary use of a taser can also constitute excessive force under specific circumstances, *see Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010), as can the gratuitous or unprovoked use of pepper spray. *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 486 (7th Cir. 2011); *see also Lewis v. Downey*, 581 F.3d 467, 477-78 (7th Cir. 2009).

*Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (inappropriate to resolve excessive force cases at summary judgment when parties give different accounts of events); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (same).

### III. Failure to Intervene

Plaintiff's next set of claims involves his allegation that as defendants Weberpal, Nordquist, Seltzner and Schroedl used excessive force on him, defendants Seltzner, Reitmeier, Olson, Nielsen, Gardner, Prieve, Meyer, and Simpson stood by idly.[13]  A police officer can be liable for another officer's excessive force if the officer had a realistic opportunity to intervene and stop the first officer's actions.  *Miller*, 761 F.3d at 826.  "A 'realistic opportunity' means a chance to warn the officer using excessive force to stop."  *Id*. However, plaintiff must also show that officers had reason to know that:  "(1) excessive force was being used, (2) . . . a citizen [was] unjustifiably arrested, or (3) . . . any constitutional violation [was] committed by a law enforcement official[.]"  *See Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

As just discussed, since plaintiff has failed to move forward past summary judgment on one or more of his claims that defendants Weberpal, Nordquist, Seltzner, or Schroedl used excessive force when arresting him, plaintiff's claims against the other defendants fall away as well.  *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying

---

[13] Because plaintiff was granted leave to proceed on excessive force and failure to intervene claims against Seltzner, the court assumes, for purposes of summary judgment, that Seltzner could have failed to intervene in earlier uses of force against plaintiff, and then used excessive force himself.

constitutional violation[.]").  Even assuming that there had been an excessive use of force, plaintiff's failure-to-intervene claims would still fail.  As an initial matter, defendant Meyer was not present at the scene of the arrest and, as a result, she had no "realistic opportunity" to intervene in any other defendant's use of excessive force.  Similarly, the undisputed facts establish that neither defendant Prieve nor defendant Nielsen participated in, saw, or heard plaintiff's arrest (dkt. #59, at 5-7), and plaintiff has not produced any evidence suggesting otherwise.  As a result, his failure-to-intervene claims against them fail as well.  Finally, plaintiff has not adduced any evidence suggesting that in the few minutes (if that) between deciding to arrest him and taking him into custody with handcuffs, a reasonable jury could find or even infer any other defendant was in a position to stop defendants Weberpal, Nordquist, Seltzner or Schroedl from using excessive force while detaining him.  To the contrary, each of those other defendants was making split-second decisions as well, and plaintiff cannot point to any harm he suffered because defendants Weberpal, Nordquist, Seltzner or Schroedl engaged in any sustained excessive force, much less because any other defendant had sufficient time to intervene.[14]  (Williams Dep. (dkt. #71) 32.)

In fairness, plaintiff speculates that the officers' "training and experience," and their presence at the Task Force's morning briefing, serves as "evidence" that they could have intervened.  (*Id*. at 21-29.)  In the alternative, he claims -- with no evidentiary support -- that officers could have yelled "stop."  (*Id*. at 23-27.)  However, "speculation and

---

[14] Again, the court will assume that Dane County Detective Seltzner could have warned officers Weberpal, Nordquist, or Schroedl that their use of force was excessive, rather than warning himself.

conjecture" cannot defeat a motion for summary judgment.  *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013).

## IV. Illegal Search

Plaintiff further claims that MPD Detective Reitmeier searched his password-protected phone and seized information from it without a warrant.[15]  A "warrant is generally required before such a search, even when a cell phone is seized incident to arrest." *Riley v. California*, 573 U.S. 373, 401 (2014).  However, defendant Reitmeier flatly denies that he ever searched plaintiff's phone or that he played a role in helping other officers to do so.

More importantly, there is simply no evidence from which a reasonable jury could find that defendant Reitmeier searched his phone.   At most, plaintiff points to unauthenticated photographs of his phone and handwritten phone numbers, as well as his own unsupported say-so, but this is not sufficient evidence of a constitutional violation. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690-91 (7th Cir. 2010); *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007).  Even if plaintiff could prove Reitmeier searched his phone, at the time of plaintiff's arrest, he was already serving a four-year term of probation, and probable cause existed to arrest him for a felony drug offense, which would violate the conditions of his probation.  As a result, defendant Reitmeier had the right under a

---

[15] Plaintiff also appears to suggest that defendant Seltzner played a role in searching his phone. (*See* dkt. #73, at 3.)  However, plaintiff was not granted leave to proceed against Seltzner on his illegal search claim, and he cannot assert a new theory for the first time in response to defendants' motions for summary judgment.  *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012).

provision of Wisconsin law known as Act 79 to seize and search plaintiff's phone without a warrant if he: (1) knew plaintiff was on probation; and (2) had reasonable suspicion that plaintiff was committing, was about to commit, or had committed a crime or had violated his terms of probation. Wis. Stat. § 973.09(1d); *State v. Anderson*, 2019 WI 97, ¶ 2, 389 Wis. 2d 106, 935 N.W.2d 285. Consequently, plaintiff's privacy interest in his phone was reduced to the point where defendant Reitmeier did not need a warrant for the search that he allegedly conducted. *United States v. Wood*, 16 F.4th 529, 534-36 (7th Cir. 2021); *United States v. McGill*, 8 F.4th 617, 622-23 (7th Cir. 2021). Indeed, the evidence strongly suggests that Reitmeier *was* aware of plaintiff's probation status, given the probationary search that had been executed on the residence where plaintiff was staying.

Finally, even if the jury could find that Reitmeier *had* taken photographs of the handwritten phone numbers that plaintiff voluntarily copied from his phone while in police custody -- as allegedly depicted in one of the unauthenticated photographs plaintiff points to in his briefing (dkt. #73, at 3) -- *and* he had no basis to believe plaintiff's probationary status allowed a warranted search of his phone, plaintiff would still be unable to provide evidence that his Fourth Amendment rights had been violated. *See United States v. Paxton*, 848 F.3d 803, 811 (7th Cir. 2017) (an "arrest itself result[s] in a diminished expectation of privacy on the part of the [arrestee]"); *see also Maryland v. King*, 569 U.S. 435, 462 (2013) ("The expectations of privacy of an individual taken into police custody 'necessarily [are] of a diminished scope.'") (citation omitted). Here, Reitmeier would have had "legitimate reasons, wholly consistent with the public interest, for monitoring individuals

[he] has taken into . . . custody[,]" that justified him taking such photographs. *See Paxton*, 848 F.3d at 813.[16]

## V.  Section 1983 Conspiracy

This leaves plaintiff's broad claim for conspiracy to violate his constitutional rights based on his allegation that Detective Reitmeier's pre-arrest briefing with the other defendants included an agreement "on a course of conduct that violate[d] the [C]onstitution" at that meeting.  (Pl.'s Compl. (dkt. #1, ¶¶ 20-22).)  In plaintiff's view, a civil conspiracy exists "whenever [] two or more police branches . . . deter [a] person from their own free will."  (Williams Dep. (dkt. #71) 34.)  However, to establish a Section 1983 conspiracy claim, plaintiff must show (1) an underlying constitutional violation, and (2) that defendants agreed to inflict that violation. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018).  As discussed above, plaintiff has failed to prove that his constitutional rights were violated.  Accordingly, his claim of a conspiracy fails under the first prong. *See Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016) ("Without a viable federal constitutional claim, the conspiracy claim under § 1983 necessarily fails; there is no independent cause of action for § 1983 conspiracy.").

In any event, plaintiff has not provided admissible evidence that defendants conspired to violate his constitutional rights during the pre-arrest briefing in the first place. In particular, plaintiff cannot rely on his own conclusory statements of fact that are beyond

---

[16] Indeed, plaintiff has no basis to even claim injury, since the inevitable discovery rule would have allowed the admission of this evidence. *See Nix v. Williams*, 467 U.S. 431, 444 (1984) (exclusionary rule would not apply where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means").

his personal knowledge and unsupported by any other evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-64 (1992). Further, although plaintiff "can use circumstantial evidence to establish a conspiracy . . . such evidence cannot be speculative." *Daugherty*, 906 F.3d at 612. Instead, he relies on a police report summarizing his arrest as proof that officers conspired during the briefing to apprehend him "by any means necessary." (Williams Dep. (dkt. #71) 21.)

Here, plaintiff concedes that he lacks personal knowledge of what was discussed in that meeting. (*Id*. at 64.) However, this report shows that what was discussed at the briefing -- plaintiff's background and criminal history, the nature of the crime for which he was being arrested, and information relevant to his arrest -- is commonly reviewed by officers in advance of field operations. Nor has plaintiff provided any evidence suggesting that defendant Reitmeier, who was absent from the meeting, otherwise conspired with any other defendant to deprive him of his rights, constitutional or otherwise. Thus, plaintiff's conspiracy claim cannot survive summary judgment given the complete lack of evidence of any agreement among the conspirators to violate his constitutional rights. *See Owens v. Evans*, 878 F.3d 559, 565 (7th Cir. 2017).

Accordingly, defendants are entitled to summary judgment on all of plaintiff's Section 1983 claims.

ORDER

IT IS ORDERED that:

1) Defendants' motions for summary judgment (dkt. #48; dkt. #57, dkt. #62) are GRANTED.

2) Plaintiff's motion for assistance in recruiting counsel (dkt. #80) and defendants' motion to stay case deadlines (dkt. #94) are DENIED as moot.

3) The clerk of court is directed to enter final judgment for defendants and close this case.

Entered this 10th day of January, 2024.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge